1  **HANNI M. FAKHOURY**
California Bar No. 252629
2  **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
3  San Diego, California  92101-5008
Telephone:  (619) 234-8467
4  Hanni_Fakhoury@fd.org

5  Attorneys for Mr. Karas

6

7

8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10                 **(HONORABLE MARILYN L. HUFF)**

11  UNITED STATES OF AMERICA,        )    CASE NO.: 08CR00253-H
                                     )
12              Plaintiff,           )
                                     )    STATEMENT OF FACTS AND
13  v.                               )    MEMORANDUM OF POINTS AND
                                     )    AUTHORITIES IN SUPPORT OF MOTIONS
14  **RICHARD MORGAN KARAS**,        )
                                     )
15              Defendant.           )
    _____ )

16

17                              **I.**

18                    **STATEMENT OF FACTS**

19         On January 30, 2008, a two count indictment was handed down by the January 2007 Grand Jury

20  charging Mr. Karas with importing 21.62 kilograms of marijuana, in violation of 21 U.S.C. §§ 952, 960 and

21  possession of marijuana with intent to distribute, in violation of 21 U.S.C.§ 841(a)(1).

22                              **II.**

23       **MOTION TO COMPEL DISCOVERY AND PRESERVE EVIDENCE**

24         Mr. Karas moves for production of the following discovery.  This request is not limited to those

25  items that the prosecutor knows of, but rather includes all discovery listed below that is in the custody,

26  control, care, or knowledge of any "closely related investigative [or other] agencies."  See United States v.

27  Bryan, 868 F.2d 1032 (9th Cir. 1989). Specifically, Mr. Karas moves for the production of the following

28  evidence:

//

1       1. **Mr. Karas's Statements.**  Mr. Karas requests the government disclose any and all written, recorded and oral statements made by him, as well any written summaries of his oral statements contained in the handwritten notes of any Government agent. Fed. R. Crim. P. 16(a)(1)(A). The Advisory Committee Notes and the 1991 amendments to Rule 16 make clear that the Government must reveal <u>all</u> of Mr. Karas's statements, whether written or oral, regardless of whether the Government intends to make any use of those statements. **Mr. Karas specifically requests any audio and videotaped copies of his statements and any rough notes taken pertaining to the substance of his statements. Furthermore, pursuant to Fed. R. Crim. P. 16(a)(1)(B)(i), Mr. Karas requests copies of the audio tapes of any taped telephone call made while he was in custody.**

       2. **Arrest Reports, Notes and Dispatch Tapes.** Mr. Karas also requests that all arrest reports, notes, dispatch or any other tapes and TECS records that relate to the circumstances surrounding his arrest or any questioning, be turned over.  This request includes, but is not limited to, any rough notes, records, reports, transcripts or other documents in which statements of Mr. Karas or any other discoverable material is contained.  Such material is discoverable under Fed. R. Crim. P. 16(a)(1)(A) and <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).  The Government must produce arrest reports, investigator's notes, memos from arresting officers, dispatch tapes, sworn statements, and prosecution reports pertaining to Mr. Karas.  <u>See</u> Fed. R. Crim. P. 16(a)(1)(B) and (c), Fed. R. Crim. P. 12(I) and 26.2. **Mr. Karas includes in this request any redacted portions of the Report of Investigation ("ROI") and any subsequent ROIs that the case agent or any other agent has written**.

       3. **Brady Material**.  Mr. Karas requests all documents, statements, agents' reports, and tangible evidence favorable to Mr. Karas on the issue of guilt and/or which affects the credibility of the Government's witnesses and the Government's case. Under <u>Brady</u>, impeachment as well as exculpatory evidence falls within the definition of evidence favorable to the accused.  <u>United States v. Bagley</u>, 473 U.S. 667 (1985); <u>United States v. Agurs</u>, 427 U.S. 97 (1976). Further, <u>Brady</u> requires the government disclose any information that may result in a lower sentence under the sentencing guidelines, notwithstanding its advisory nature, because it is exculpatory and/or mitigating evidence.

       4. **Mr. Karas's Prior Record.**  Mr. Karas requests disclosure of his prior criminal record. Fed. R. Crim. P. 16(a)(1)(B). **Specifically, he requests a certified copy of the charging documents, plea and**

1  sentencing transcripts, and judgment and conviction of any prior conviction used to increase or adjust

2  Mr. Karas's sentence under the advisory guidelines.

3       5. **Any Proposed 404(b) Evidence.**  Evidence of prior similar acts is discoverable under Fed. R.

4  Crim. P. 16(a)(1)(c) and Fed. R. Evid. 404(b) and 609.  In addition, under Fed. R. Evid. 404(b), "upon

5  request of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the

6  general nature . . . ." of any evidence the government proposes to introduce under Fed. R. Evid. 404(b) at

7  trial.  Mr. Karas requests the government "articulate <u>precisely</u> the evidential hypothesis by which a fact of

8  consequence may be inferred from the other acts evidence." <u>United States v. Mehrmanesh</u>, 689 F.2d 822,

9  830 (9th Cir. 1982) (emphasis added; internal citations omitted); <u>see also</u> <u>United States v. Brooke</u>, 4 F.3d

10  1480, 1483 (9th Cir. 1993) (reaffirming <u>Mehrmanesh</u> and reversing convictions). Mr. Karas requests **three**

11  **weeks notice before trial** to give the defense time to adequately investigate and prepare for trial.

12       6. **Evidence Seized.**  Mr. Karas requests production of evidence seized as a result of any search,

13  either warrantless or with a warrant. Fed. R. Crim. P. 16(a)(1)(c).

14       7. **Request for Preservation of Evidence.**  Mr. Karas specifically requests that all dispatch tapes

15  or any other physical evidence that may be destroyed, lost, or otherwise put out of the possession, custody,

16  or care of the government and which relate to the arrest or the events leading to the arrest in this case be

17  preserved.  This request includes, but is not limited to, any samples of narcotics used to run any scientific

18  tests, all narcotics, the results of any fingerprint analysis, the vehicle involved in the case, the defendant's

19  personal effects, and any evidence seized from the defendant or any third party.  This request also includes

20  any material or percipient witnesses who might be deported or otherwise likely to become unavailable (e.g.

21  undocumented aliens and transients). It is requested that the prosecutor be ordered to <u>question</u> all the

22  agencies and individuals involved in the prosecution and investigation of this case to determine if such

23  evidence exists, and if it does exist, to inform those parties to preserve any such evidence.

24       8. **Tangible Objects.**  Mr. Karas requests the opportunity to inspect, copy, and test, as necessary, all

25  other documents and tangible objects, including photographs, books, papers, documents,  fingerprint

26  analyses, or copies of portions thereof, which are material to the defense, intended for use in the

27  Government's case-in-chief, or were obtained from or belong to Mr. Karas. Fed. R. Crim. P. 16(a)(1)(c).

28  //

**Specifically, Mr. Karas requests color copies of all photographs in this case in the Government's possession**.

9. **TECS Reports**. Defendant requests all TECS reports, including reports pertaining to all vehicle border crossings pertaining to the vehicle used in this case and any vehicles pertaining to Mr. Karas.

10. **Opportunity to Weigh, View and Photograph the Contraband**. Mr. Karas hereby requests an opportunity to view, photograph, and weigh the contraband allegedly confiscated in this case.

11. **DEA 7 Form**. Mr. Karas requests a copy of the DEA 7 form that should indicate the alleged weight and purity of the contraband in this case.

12. **Narcotics Detector Dog Information**. Mr. Karas moves for production of all discoverable information about any Narcotics Detector Dogs (NDDs) used in this case, including information regarding: (a) the qualifications of the NDDs and their handlers, (b) the training and experience of the NDDs and their handlers, (c) the government's procedures regarding the treatment, training and rewarding of the NDDs, (d) a detailed description of the exact method the NDDs in this case used to indicate an "alert" to contraband, and (e) the location of the NDD and the vehicle when the NDD alerted, and (f) the NDD's reliability.

13. **Expert Witnesses.** Mr. Karas requests the name, qualifications, and a written summary of the testimony of any person that the Government intends to call as an expert witness during its case in chief. Fed. R. Crim. P. 16(a)(1)(E). The defense requests the notice of expert testimony be provided a minimum of **three weeks prior to trial** so the defense can properly prepare to address and respond to this testimony, including obtaining its own expert and/or investigating the opinions, credentials of the Government's expert and a hearing in advance of trial to determine the admissibility of qualifications of any expert.  See Kumho Tire Co., Ltd. v.  Carmichael, 526 U.S. 137, 152 (1999) (trial judge is "gatekeeper" and must determine, reliability and relevancy of expert testimony and such determinations may require "special briefing or other proceedings").

14. **Scientific and Other Information.** Mr. Karas requests the results of any scientific or other tests or examinations conducted by any Government agency or their subcontractors in connection with this case. See Fed. R. Crim. P. 16(a)(1)(D).

15. **_Henthorn_ Material.** Mr. Karas requests that the Assistant United States Attorney ("AUSA") assigned to this case oversee (not personally conduct) a review of all personnel files of each agent involved

1  in the present case for impeachment material.  See Kyles v. Whitley, 514 U.S. 419 (1995) (holding that "the

2  individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the

3  Government's behalf in the case, including the police"); United States v. Henthorn, 931 F.2d 29 (9th Cir.

4  1991); United States v. Jennings, 960 F.2d 1488 (9th Cir. 1992) (AUSA may not be ordered to personally

5  conduct examination of records; appropriate Government agency may review files and notify AUSA of

6  contents as long as AUSA makes the determination regarding material to be disclosed); United States v.

7  Herring, 83 F.3d 1120 (9th Cir. 1996) (accord).

8      16. **Evidence of Bias or Motive to Lie.**  Mr. Karas requests any evidence that any prospective

9  Government witness is biased or prejudiced against Mr. Karas, or has a motive to falsify or distort his or her

10  testimony.

11      17. **Impeachment Evidence.**  Mr. Karas requests any evidence that any prospective Government

12  witness has engaged in any criminal act whether or not resulting in a conviction and whether any witness

13  has made a statement favorable to Mr. Karas.  See Fed. R. Evid. 608, 609 and 613; Brady v. Maryland, 373

14  U.S. 83 (1963).

15      18. **Evidence of Criminal Investigation of Any Government Witness.**  Mr. Karas requests any

16  evidence that any prospective witness is under investigation by federal, state or local authorities for any

17  criminal conduct.

18      19. **Evidence Affecting Perception, Recollection, Ability to Communicate, or Truth Telling.**

19  Mr. Karas requests any evidence, including any medical or psychiatric report or evaluation, that tends to

20  show that any prospective witness' ability to perceive, remember, communicate, or tell the truth is impaired,

21  and any evidence that a witness has ever used narcotics or other controlled substances, or has ever been an

22  alcoholic.

23      20. **Witness Addresses.**  Mr. Karas requests the name and last known address of each prospective

24  Government witness.  Mr. Karas also requests the name and last known address of every witness to the crime

25  or crimes charged (or any of the overt acts committed in furtherance thereof) who will not be called as a

26  Government witness.

27  //

28  //

21. **Name of Witnesses Favorable to Mr. Karas.** Mr. Karas requests the name of any witness who made an arguably favorable statement concerning Mr. Karas or who could not identify him or who was unsure of his identity, or participation in the crime charged.

22. **Statements Relevant to the Defense.** Mr. Karas requests disclosure of any statement relevant to any possible defense or contention that he might assert in his defense.

23. **Giglio Information & Agreements Between the Government and Witnesses.** Pursuant to Giglio v. United States, 405 U.S. 150 (1972), Mr. Karas requests all statements and/or promises, express or implied, made to any witness, in exchange for their testimony in this case, and all other information which could be used for impeachment. Mr. Karas also requests discovery regarding any other express or implicit promise, understanding, offer of immunity, of past, present, or future compensation, or any other kind of agreement, promise, or understanding, including any implicit understanding relating to criminal or civil income tax, forfeiture or fine liability, between any prospective Government witness and the Government (federal, state and/or local). This request also includes any discussion with a potential witness about or advice concerning any contemplated prosecution, or any possible plea bargain, even if no bargain was made, or the advice not followed, and specifically includes any discussion with a potential witness regarding that witness' immigration status and/or any affect that the witness' statements or lack thereof might have on that status, including the granting or revoking of such immigration status or any other immigration status, including but not limited to citizenship, nationality, a green card, border crossing card, parole letter, or permission to remain in the United States.

24. **Informants and Cooperating Witnesses.** Mr. Karas requests disclosure of the names and addresses of all informants or cooperating witnesses used or to be used in this case, and in particular, disclosure of any informant who was a percipient witness in this case or otherwise participated in the crime charged against Mr. Karas. The Government must disclose the informant's identity and location, as well as the existence of any other percipient witness unknown or unknowable to the defense. Roviaro v. United States, 353 U.S. 53, 61-62 (1957). The Government must disclose any information derived from informants which exculpates or tends to exculpate Mr. Karas. Brady v. Maryland, 373 U.S. 83 (1963).

25. **Bias by Informants or Cooperating Witnesses.** Mr. Karas requests disclosure of any information indicating bias on the part of any informant or cooperating witness. Giglio v. United States, 405

1  U.S. 150 (1972).  Such information includes, but is not limited to, any inducements, favors, payments or

2  threats that were made to the witness in order to secure cooperation with the authorities.

3      26. **Jencks Act Material.**  Mr. Karas requests production in advance of trial of all material, including

4  dispatch tapes, which the Government must produce pursuant to the Jencks Act, 18 U.S.C. § 3500.  Advance

5  production will avoid the possibility of delay at trial to allow Mr. Karas to investigate the Jencks material.

6  A verbal acknowledgment that "rough" notes constitute an accurate account of the witness' interview is

7  sufficient for the report or notes to qualify as a statement under § 3500(e)(1).  Campbell v. United States,

8  373 U.S. 487, 490-92 (1963); see United States v. Boshell, 952 F.2d 1101 (9th Cir. 1991) (agent's interview

9  notes reviewed with interviewee subject to Jencks Act).

10      27. **Residual Request.**  Mr. Karas intends by this discovery motion to invoke his rights to discovery

11  to the fullest extent possible under the Federal Rules of Criminal Procedure and the Constitution and laws

12  of the United States.  Mr. Karas requests that the Government provide him and his attorney with the above

13  requested material sufficiently in advance of trial to avoid unnecessary delay prior to cross-examination.

14                                          **III.**

15   **THE INDICTMENT SHOULD BE DISMISSED BECAUSE JUDGE BURNS'S**
    **INSTRUCTIONS AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY RUN**
16  **AFOUL OF BOTH *NAVARRO-VARGAS* AND *WILLIAMS* AND VIOLATE THE FIFTH**
    **AMENDMENT BY DEPRIVING MR. KARAS OF THE TRADITIONAL FUNCTIONING OF**
17                          **THE GRAND JURY**

18  **A.    Introduction.**

19      The indictment in the instant case was returned by the January 2007 grand jury.  See CR at 6.[1]  That

20  grand jury was instructed by Judge Burns on January 11, 2007.  See Reporter's Partial Transcript of the

21  Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit A.  Judge Burns's

22  instructions to the impaneled grand jury deviate from the instructions at issue in the major Ninth Circuit

23  cases challenging a form grand jury instruction previously given in this district in several ways.[2]  These

24

25          [1] "CR" refers to the Clerk's Record in Case Number 07CR2364-LAB.

26
           [2] See, e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States v. Navarro-
27  Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005) (Navarro-Vargas II); United
    States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-Vargas I); United States v. Marcucci, 299
28  F.3d 1156 (9th Cir. 2002) (per curiam).

1  instructions compounded Judge Burns's erroneous instructions and comments to prospective grand jurors

2  during voir dire of the grand jury panel, which immediately preceded the instructions at Ex. A.  See

3  Reporter's Transcript of Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit

4  B.[3]

5       **1.    Judge Burns Instructed Grand Jurors That Their Singular Duty Is to**
          **Determine Whether or Not Probable Cause Exists and That They Have**
6          **No Right to Decline to Indict When the Probable Cause Standard Is**
          **Satisfied.**

7

8        After repeatedly emphasizing to the grand jurors that probable cause determination was their sole

9  responsibility, see Ex. A at 3, 3-4, 5,[4] Judge Burns instructed the grand jurors that they were forbidden "from

10  judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a

11  federal law or should not be a federal law designating certain activity [as] criminal is not up to you."  See

12  id. at 8.  The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with

13  that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting

14  even though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence

15  may be insufficient.'"  See id. at 8-9.  Thus, the instruction flatly bars the grand jury from declining to indict

16  because the grand jurors disagree with a proposed prosecution.

17        Immediately before limiting the grand jurors' powers in the way just described, Judge Burns referred

18  to an instance in the grand juror selection process in which it excused three potential jurors.  See id. at 8.

19        I've gone over this with a couple of people.  You understood from the questions and answers
          that a couple of people were excused, I think three in this case, because they could not adhere
20        to the principle that I'm about to tell you.

21  Id.  That "principle" was Judge Burns's discussion of the grand jurors' inability to give effect to their

22  disagreement with Congress.  See id. at 8-9.  Thus, the Court not only instructed the grand jurors on its view

23  of their discretion; it enforced that view on pain of being excused from service as a grand juror.

24

25        [3] The transcript of the voir dire indicates that grand jurors were shown a video presentation on the
26  role of the grand jury.  Mr. Fernandez-Serrano requests that the video presentation be produced.  See United
   States v. Alter, 482 F.2d 1016, 1029 n.21 (9th Cir. 1973) ("[t]he proceedings before the grand jury are secret,
27  but the ground rules by which the grand jury conducts those proceedings are not.").

28        [4] See also id. at 20 ("You're all about probable cause.").

1    Examination of the recently disclosed voir dire transcript, which contains additional instructions and

2   commentary in the form of the give and take between Judge Burns and various prospective grand jurors,

3   reveals how Judge Burns's emphasis of the singular duty is to determine whether or not probable cause

4   exists and his statement that grand jurors they cannot judge the wisdom of the criminal laws enacted by

5   Congress merely compounded an erroneous series of instructions already given to the grand jury venire.  In

6   one of his earliest substantive remarks, Judge Burns makes clear that the grand jury's sole function is

7   probable cause determination.

8       [T]he grand jury is determining really two factors: "do we have a reasonable belief that a
        crime was committed?  And second, do we have a reasonable belief that the person that they
9       propose that we indict committed the crime?"

10      If the answer is "yes" to both of those, then the case should move forward.  If the answer to
        either of the questions is "no," then the grand jury should not hesitate and not indict.
11

12  See Ex. B at 8.  In this passage, Judge Burns twice uses the term "should" in a context makes clear that the

13  term is employed to convey instruction: "should" cannot reasonably be read to mean optional when it

14  addresses the obligation not to indict when the grand jury has no "reasonable belief that a crime was

15  committed" or if it has no "reasonable belief that the person that they propose that we indict committed the

16  crime."

17      Equally revealing is Judge Burns's interactions with two potential grand jurors who indicated that,

18  in some unknown set of circumstances, they might decline to indict even where there was probable cause.

19  Because of the redactions of the grand jurors' names, Mr. Karas will refer to them by occupation.  One is

20  a retired clinical social worker (hereinafter CSW), and the other is a real estate agent (hereinafter REA).  The

21  CSW indicated a view that no drugs should be considered illegal and that some drug prosecutions were not

22  an effective use of resources.  See id. at 16.  The CSW was also troubled by certain unspecified immigration

23  cases.  See id.

24      Judge Burns made no effort to determine what sorts of drug and immigration cases troubled the

25  CSW.  He never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in

26  this district, such as drug smuggling cases and cases involving reentry after deportation and alien smuggling.

27  Rather, Judge Burns provided instructions suggesting that, in any event, any scruples CSW may have

28  possessed were simply not capable of expression in the context of grand jury service.

1   Now, the question is can you fairly evaluate [drug cases and immigration cases]? Just as the
2   defendant is ultimately entitled to a fair trial and the person that's accused is entitled to a fair
    appraisal of the evidence of the case that's in front of you, so, too, is the United States
3   entitled to a fair judgment. If there's probable cause, then the case should go forward. *I
    wouldn't want you to say*, "well, yeah, there's probable cause, but I still don't like what our
4   government is doing. I disagree with these laws, so I'm not going to vote for it to go
    forward." If that is your frame of mind, the probably you shouldn't serve. Only you can tell
    me that.

5

6   See id. at 16-17 (emphasis added). Thus, without any sort of context whatsoever, Judge Burns let the grand

7   juror know that it would not want him or her to decline to indict in an individual case where the grand juror

8   "[didn't] like what our government is doing," see id. at 17, but in which there was probable cause. See Id.

9   Such a case "should go forward." See id. Given that blanket proscription on grand juror discretion, made

10  manifest by Judge Burns's use of the pronoun "I", the CSW indicated that it "would be difficult to support

11  a charge even if [the CSW] thought the evidence warranted it." See id. Again, Judge Burns's question

12  provided no context; it inquired regarding "a case," a term presumably just as applicable to possession of

13  a small amount of medical marijuana as kilogram quantities of methamphetamine for distribution. Any

14  grand juror listening to this exchange could only conclude that there was *no* case in which Judge Burns

15  would permit them to vote "no bill" in the face of a showing probable cause.

16      Just in case there may have been a grand juror that did not understand his or her inability to exercise

17  anything like prosecutorial discretion, Judge Burns drove the point home in his exchange with REA. REA

18  first advised Judge Burns of a concern regarding the "disparity between state and federal law" regarding

19  "medical marijuana." See id. at 24. Judge Burns first sought to address REA's concerns about medical

20  marijuana by stating that grand jurors, like trial jurors, are simply forbidden from taking penalty

21  considerations into account.

22      Well, those things -- the consequences of your determination shouldn't concern you in the
        sense that penalties or punishment, things like that -- we tell trial jurors, of course, that
23      they cannot consider the punishment or the consequence that Congress has set for these
        things. We'd ask you to also abide by that. We want you to make a business-like
24      decision of whether there was a probable cause. . . .

25  Id. at 24-25. Having stated that REA was to "abide" by the instruction given to trial jurors, Judge Burns

26  went on to suggest that REA recuse him or herself from medical marijuana cases. See id. at 25.

27  //

28  //

1    In response to further questioning, REA disclosed REA's belief "that drugs should be legal." See id.

2    That disclosure prompted Judge Burns to begin a discussion that ultimately led to an instruction that a grand

3    juror is obligated to vote to indict if there is probable cause.

4    I can tell you sometimes I don't agree with some of the legal decisions that are indicated that
     I have to make. But my alternative is to vote for someone different, vote for someone that
5    supports the policies I support and get the law changed. It's not for me to say, "well, I don't
     like it. So I'm not going to follow it here."

6
     You'd have a similar obligation as a grand juror even though you might have to grit your
7    teeth on some cases. Philosophically, if you were a member of congress, you'd vote against,
     for example, criminalizing marijuana. I don't know if that's it, but you'd vote against
8    criminalizing some drugs.

9    That's not what your prerogative is here. You're prerogative instead is to act like a judge and
     say, "all right. This is what I've to deal with objectively. Does it seem to me that a crime
10   was committed? Yes. Does it seem to me that this person's involved? It does." *And then
     your obligation, if you find those to be true, would be to vote in favor of the case going*
11   *forward.*

12   Id. at 26-27 (emphasis added). Thus, the grand juror's duty is to conduct a simple two part test, which, if

13   both questions are answered in the affirmative, lead to an "obligation" to indict.

14   Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that

15   paradigm, Judge Burns then set about to ensure that there was no chance of a deviation from the obligation

16   to indict in every case in which there was probable cause.

17   The Court: Do you think you'd be inclined to let people go in drug cases even though you
     were convinced there was probable cause they committed a drug offense?
18   REA: It would depend on the case.
     The Court: Is there a chance that you would do that?
19   REA: Yes.
     The Court: I appreciate your answers. I'll excuse you at this time.
20

21   Id. at 27. Two aspects of this exchange are crucial. First, REA plainly does not intend to act solely on his

22   political belief in decriminalization -- whether he or she would indict "depend[s] on the case," see id., as it

23   should. Because REA's vote "depend[s] on the case," see id., it is necessarily true that REA would vote to

24   indict in some (perhaps many or even nearly all) cases in which there was probable cause. Again, Judge

25   Burns made no effort to explore REA's views; it did not ascertain what sorts of cases would prompt REA

26   to hesitate. The message is clear: it does not matter what type of case might prompt REA's reluctance to

27   indict because, once the two part test is satisfied, the "obligation" is "to vote in favor of the case going

28   //

1    forward."[5]  See id. at 27.  That is why even the "chance," see id., that a grand juror might not vote to indict

2    was too great a risk to run.

3        **2.**    **The Instructions Posit a Non-Existent Prosecutorial Duty to Offer**
                       **Exculpatory Evidence.**

4

5          In addition to his instructions on the authority to choose not to indict, Judge Burns also assured the

6    grand jurors that prosecutors would present to them evidence that tended to undercut probable cause.  See

7    Ex. A at 20.[6]

8          Now, again, this emphasizes the difference between the function of the grand jury and the
             trial jury.  You're all about probable cause.  If you think that there's evidence out there that

9

10         [5] This point is underscored by Judge Burns's explanation to the Grand Jury that a magistrate judge

11   will have determined the existence of probable cause "in most circumstances" before it has been presented

12   with any evidence.  See Ex. A at 6.  This instruction created an imprimatur of finding probable cause in each
     case because had a magistrate judge not so found, the case likely would not have been presented to the Grand
     Jury for indictment at all.  The Grand Jury was informed that it merely was redundant to the magistrate court

13   "in most circumstances."  See id.  This instruction made the grand jury more inclined to indict irrespective

14   of the evidence presented.

15         [6] These instructions were provided in the midst of several comments that praised the United States
     attorney's office and prosecutors in general.  Judge Burns advised the grand jurors that they "can expect that

16   the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and . . . they'll act
     in good faith in all matters presented to you."  See Ex. A at 27.  The instructions delivered during voir dire

17   go even further.  In addressing a prospective grand juror who revealed "a strong bias for the U.S. Attorney,
     whatever cases they might bring," see Ex. B at 38, Judge Burns affirmatively endorsed the prospective

18   juror's view of the U.S. Attorney's office, even while purporting to discourage it: "frankly, I agree with the
     things you are saying.  They make sense to me."  See id. at 43.  See also id. at 40 ("You were saying that you

19   give a presumption of good faith to the U.S. Attorney and assume, quite logically, that they're not about the
     business of trying to indict innocent people or people that they believe to be innocent or the evidence doesn't

20   substantiate the charges against.").

21         Judge Burns's discussion of his once having been a prosecutor before the Grand Jury compounded
     the error inherent in his praising of the government attorneys.  See Ex. A at 9-10.  Judge Burns's instructions

22   implied that as a prior prosecutor and current "jury liaison judge," see id. at 8, Judge Burns would not allow
     the government attorneys to act inappropriately or to present cases for indictment where no probable cause

23   existed.

24         In addition, while Judge Burns instructed the Grand Jury that it had the power to question witnesses,
     Judge Burns's instructions also told the Grand Jury that it should "be deferential to the U.S. Attorney if there

25   is an instance where the U.S. Attorney thinks a question ought not to be asked."  See Ex. A at 12.  As the
     dissent in Navarro-Vargas pointed out, "the grand jury's independence is diluted by [such an] instruction,

26   which encourages deference to prosecutors."  Navarro-Vargas, 408 F.3d at 1215.  The judge's admonition
     that his statement was only "advice," see Ex A at 12, does not cure the error as courts regularly presume

27   grand jurors follow instructions provided to them by the court.  See id. at 1202, n.23 ("We must presume
     that grand jurors will follow instructions because, in fact, we are prohibited from examining jurors to verify

28   whether they understood the instruction as given and then followed it.").

08CR00253-H

might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.*

Id. (emphasis added).

The antecedent to this instruction is also found in the voir dire. After advising the grand jurors that "the presentation of evidence to the grand jury is necessarily one-sided," see Ex. B at 14, Judge Burns gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball. If there's something adverse or that cuts against the charge, you'll be informed of that. They have a duty to do that." See id. Thus, Judge Burns unequivocally advised the grand jurors that the government would present any evidence that was "adverse" or "that cuts against the charge." See id.

**B.    Navarro-Vargas Establishes Limits on the Ability of Judges to Constrain the Powers of the Grand Jury, Which Judge Burns Far Exceeded in His Instructions as a Whole During Impanelment.**

The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to grand jurors in the Southern District of California. See Navarro-Vargas II, 408 F.3d 1184. While the Ninth Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic approach[7] to the problems posed by the instructions, endorsed many of the substantive arguments raised by the defendants in those cases. The district court's instructions cannot be reconciled with the role of the grand jury as set forth in Navarro-Vargas II. Taken together, the voir dire of and instructions given to the January 2007 Grand Jury, go far beyond those at issue in Navarro-Vargas, taking a giant leap in the direction of a bureaucratic, deferential grand jury, focused solely upon probable cause determinations and utterly unable to exercise any quasi-prosecutorial discretion. That is not the institution the Framers envisioned. See United States v. Williams, 504 U.S. 36, 49 (1992).

For instance, with respect to the grand jury's relationship with the prosecution, the Navarro-Vargas II majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in

_____

[7] See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority because "[t]he instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").

1  deciding whether a particular prosecution shall be instituted or followed up, performs much the same

2  function as a grand jury.'" Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v. Economou, 438 U.S. 478,

3  510 (1978)).  Accord United States v. Navarro-Vargas, 367 F.3d 896, 900 (9th Cir. 2004) (Navarro-Vargas

4  I)(Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as

5  prosecutorial." ).  See also Navarro-Vargas II, 408 F.3d at 1213 (Hawkins, J., dissenting).  It recognizes that

6  the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, id.,

7  but also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted

8  by the prosecutor."  Id.  See Niki Kuckes, The Democratic Prosecutor:  Explaining the Constitutional

9  Function of the Federal Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict

10  was "'arguably . . . the most important attribute of grand jury review from the perspective of those who

11  insisted that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., Criminal

12  Procedure § 15.2(g) (2d ed. 1999)).

13        Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the attributes set forth

14  in Vasquez v. Hillery, 474 U.S. 254 (1986).  See id.

> 15  The grand jury thus determines not only whether probable cause exists, but also whether to
> 16  "charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps
>     most significant of all, a capital offense or a non-capital offense -- all on the basis of the
>     same facts.  And, significantly, the grand jury may refuse to return an indictment even
> 17  "'where a conviction can be obtained.'"

18  Id. (quoting Vasquez, 474 U.S. at 263).  The Supreme Court has itself reaffirmed Vasquez's description of

19  the grand jury's attributes in Campbell v. Louisiana, 523 U.S. 392 (1998), noting that the grand jury

20  "controls not only the initial decision to indict, but also significant questions such as how many counts to

21  charge and whether to charge a greater or lesser offense, including the important decision whether to charge

22  a capital crime." Id. at 399 (citing Vasquez, 474 U.S. at 263). Judge Hawkins notes that the Navarro-Vargas

23  II majority accepts the major premise of Vasquez: "the majority agrees that a grand jury has the power to

24  refuse to indict someone even when the prosecutor has established probable cause that this individual has

25  committed a crime." See id. at 1214 (Hawkins, J. dissenting).  Accord Navarro-Vargas I, 367 F.3d at 899

26  (Kozinski, J., dissenting); United States v. Marcucci, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (per curiam)

27  (Hawkins, J., dissenting).  In short, the grand jurors' prerogative not to indict enjoys strong support in the

28  Ninth Circuit.  But not in Judge Burns's instructions.

08CR00253-H

1  **C.   Judge Burns's Instructions Forbid the Exercise of Grand Jury Discretion Established**
2  **in Both *Vasquez* and *Navarro-Vargas II*.**

3        The Navarro-Vargas II majority found that the instruction in that case "leave[s] room for the grand

4  jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous

5  decision in Marcucci. Marcucci reasoned that the instructions do not mandate that grand jurors indict upon

6  every finding of probable cause because the term "should" may mean "what is probable or expected."  299

7  F.3d at 1164 (citation omitted).  That reading of the term "should" makes no sense in context, as Judge

8  Hawkins ably pointed out.  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The

9  instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or

10  obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").  See

11  also id. ("The 'word' should is used to express a duty [or] obligation.") (quoting The Oxford American

12  Diction and Language Guide 1579 (1999) (brackets in original)).

13        The debate about what the word "should" means is irrelevant here; the instructions here make no

14  such fine distinction.  The grand jury instructions make it painfully clear that grand jurors simply may not

15  choose not to indict in the event of what appears to them to be an unfair application of the law: should "you

16  disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against

17  indicting even though I think that the evidence is sufficient'...."  See Ex. A at 8-9.  Thus, the instruction

18  flatly bars the grand jury from declining to indict because they disagree with a proposed prosecution. No

19  grand juror would read this language as instructing, or even allowing, him or her to assess "the need to

20  indict."  Vasquez, 474 U.S. at 264.

21        While Judge Burns used the word "should" instead of "shall" during voir dire with respect to whether

22  an indictment was required if probable cause existed, see Ex. B at 4, 8, in context, it is clear that Judge Burns

23  could only mean "should" in the obligatory sense.  For example, when addressing a prospective juror, Judge

24  Burns not only told the jurors that they "should" indict if there is probable cause, it told them that if there

25  is not probable cause, "then the grand jury should hesitate and not indict."  See id. at 8.  At least in context,

26  it would strain credulity to suggest that Judge Burns was using "should" for the purpose of "leaving room

27  for the grand jury to [indict] even if it finds [no] probable cause."  See Navarro-Vargas, 408 F.3d at 1205.

28  Clearly Judge Burns was not.

1   The full passage cited above effectively eliminates any possibility that Judge Burns intended the

2   Navarro-Vargas spin on the word "should."

3       [T]he grand jury is determining really two factors: "do we have a reasonable belief that a
        crime was committed? And second, do we have a reasonable belief that the person that they
4       propose that we indict committed the crime?"

5       If the answer is "yes" to both of those, then the case should move forward. If the answer to
        either of the questions is "no," then the grand jury should not hesitate and not indict.

6

7   See Ex. B at 8. Of the two sentences containing the word "should," the latter of the two essentially states

8   that if there is no probable cause, you *should* not indict. Judge Burns could not possibly have intended to

9   "leav[e] room for the grand jury to [indict] even if it finds [no] probable cause." See Navarro-Vargas, 408

10  F.3d at 1205 (citing Marcucci, 299 F.3d at 1159). That would contravene the grand jury's historic role of

11  protecting the innocent. See, e.g., United States v. Calandra, 414 U.S. 338, 343 (1974) (The grand jury's

12  "responsibilities continue to include both the determination whether there is probable cause and the

13  protection of citizens against unfounded criminal prosecutions.") (citation omitted).

14      By the same token, if Judge Burns said that "the case should move forward" if there is probable

15  cause, but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," see

16  Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then Judge Burns would have to have

17  intended two different meanings of the word "should" in the space of two consecutive sentences. That could

18  not have been his intent. But even if it were, no grand jury could ever have had that understanding.[8] Jurors

19  are not presumed to be capable of sorting through internally contradictory instructions. See generally United

20  States v. Lewis, 67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court cannot

21  presume that the jury followed the correct one") (citation, internal quotations and brackets omitted).

22      Lest there be any room for ambiguity, on no less than four occasions, Judge Burns made it explicitly

23  clear to the grand jurors that "should" was not merely suggestive, but obligatory:

24  //

25

26  _____

27     [8] This argument does not turn on Mr. Karas' view that the Navarro-Vargas/Marcucci reading of the
    word "should" in the model instructions is wildly implausible. Rather, it turns on the context in which the
28  word is employed by Judge Burns in his unique instructions, context which eliminates the Navarro-
    Vargas/Marcucci reading as a possibility.

1      **(1)**      The first occasion occurred in the following exchange when Judge Burns conducted voir dire

2  and excused a potential juror (CSW):

3          The Court: . . . If there's probable cause, then the case should go forward. I wouldn't want
         you to say, "Well, yeah, there's probable cause. But I still don't like what the government
4          is doing. I disagree with these laws, so I'm not going to vote for it to go forward." If that's
         your frame of mind, then probably you shouldn't serve. Only you can tell me that.
5          Prospective Juror: Well, I think I may fall in that category.
         The Court: In the latter category?
6          Prospective Juror: Yes.
         The Court: Where it would be difficult for you to support a charge even if  you thought the
7          evidence warranted it?
         Prospective Juror: Yes.
8          The Court: I'm going to excuse you then.

9  See Ex. B at 17. There was nothing ambiguous about the word "should" in this exchange with a prospective

10 juror. Even if the prospective juror did not like what the government was doing in a particular case, that case

11 "should go forward" and Judge Burns expressly disapproved of any vote that might prevent that. See id. ("I

12 wouldn't want you [to vote against such a case]"). The sanction for the possibility of independent judgment

13 was dismissal, a result that provided full deterrence of that juror's discretion and secondary deterrence as

14 to the exercise of discretion by any other prospective grand juror.

15      **(2)**      In an even more explicit example of what "should" meant, Judge Burns makes clear that it

16 there is an unbending obligation to indict if there is probable cause. Grand jurors have no other prerogative.

17 Court  . . . It's not for me to say, "Well, I don't like it. So I'm not going to follow it here."

18          You'd have a similar *obligation* as a grand juror even though you might have to grit your
         teeth on some cases. Philosophically, if you were a member of Congress, you'd vote against,
19          for example, criminalizing marijuana. I don't know if that's it, but you'd vote against
         criminalizing some drugs.

20          That's not what your *prerogative* is here. Your prerogative instead is act like a judge and to
21          say, "All right. This is what I've got to deal with objectively. Does it seem to me that a
         crime was committed? Yes. Does it seem to me that this person's involved? It does." *And*
22          *then your obligation, if you find those things to be true, would be to vote in favor of the case*
         *going forward.*

23

24 Id. at 26-27 (emphasis added). After telling this potential juror (REA) what his obligations and prerogatives

25 were, the Court inquired as to whether "you'd be inclined to let people go on drug cases even though you

26 were convinced there was probable cause they committed a drug offense?" Id. at 27. The potential juror

27 responded: "It would depend on the case." Id. Nevertheless, that juror was excused. Id. at 28. Again, in

28 //

1  this context, and contrary to the situation in <u>Navarro-Vargas</u>, "should" means "shall"; it is obligatory, and

2  the juror has no prerogative to do anything other than indict if there is probable cause.

3      Moreover, as this example demonstrates, the issue is not limited to whether the grand jury believes

4  a particular law to be "unwise." This juror said that any decision to indict would not depend on the law, but

5  rather it would "depend on the case." Thus, it is clear that Judge Burns's point was that if a juror could not

6  indict on probable cause for *every* case, then that juror was not fit for service. It is equally clear that the

7  prospective juror did not dispute the "wisdom of the law;" he was prepared to indict under some factual

8  scenarios, perhaps many. But Judge Burns did not pursue the question of what factual scenarios troubled

9  the prospective jurors, because his message is that there is no discretion not to indict.

10     **(3)**    As if the preceding examples were not enough, Judge Burns continued to pound the point

11 home that "should" meant "shall" when it told another grand juror during voir dire: "[W]hat I have to insist

12 on is that you follow the law that's given to us by the United States Congress. We enforce the federal laws

13 here." <u>See</u> <u>id.</u> at 61.

14     **(4)**    And then again, after swearing in all the grand jurors who had already agreed to indict in

15 every case where there was probable cause, Judge Burns reiterated that "should" means "shall" when it

16 reminded them that "your option is not to say 'well, I'm going to vote against indicting even though I think

17 that the evidence is sufficient . . . . Instead your *obligation* is . . . not to bring your personal definition of

18 what the law ought to be and try to impose that through applying it in a grand jury setting." <u>See</u> Ex. A at 9.

19     Moreover, Judge Burns advised the grand jurors that the were forbidden from considering the

20 penalties to which indicted persons may be subject.

21     Prospective Juror (REA): ... And as far as being fair, it kind of depends on what the case is
    about because there is a disparity between state and federal law.

22     The Court: In what regard?
    Prospective Juror: Specifically, medical marijuana.

23     The Court: Well, those things -- the consequences of your determination shouldn't concern
    you in the sense that penalties or punishment, things like that -- *we tell trial jurors, of course,*

24     *that they cannot consider the punishment or the consequence that Congress has set for these*
    *things. We'd ask you to also abide by that.* We want you to make a business-like decision

25     of whether there was a probable cause. ...

26 <u>See</u> Ex. B at 24-25 (emphasis added). A "business-like decision of whether there was a probable cause"

27 would obviously leave no role for the consideration of penalty information.

28 *//*

1    The Ninth Circuit previously rejected a claim based upon the proscription against consideration of

2    penalty information based upon the same unlikely reading of the word "should" employed in Marcucci.  See

3    United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006).  Cortez-Rivera is inapposite for two

4    reasons.  First, Judge Burns did not use the term "should" in the passage quoted above.  Second, that context,

5    as well as his consistent use of a mandatory meaning in employing the term, eliminate the ambiguity (if there

6    ever was any) relied upon by Cortez-Rivera.  The instructions again violate Vasquez, which plainly

7    authorized consideration of penalty information.  See 474 U.S. at 263.

8    Noting can mask the undeniable fact that Judge Burns explicitly instructed the jurors time and time

9    again that they had a duty, an obligation, and a singular prerogative to indict each and every case where there

10   was probable cause.  These instructions go far beyond the holding of Navarro-Vargas and stand in direct

11   contradiction of the Supreme Court's decision in Vasquez.  Indeed, it defies credulity to suggest that a grand

12   juror hearing these instructions, and that voir dire, could possibly believe what the Supreme Court held in

13   Vasquez:

14       The grand jury does not determine only that probable cause exists to believe that a defendant
         committed a crime, or that it does not.  In the hands of the grand jury lies the power to charge

15       a greater offense or a lesser offense; numerous counts or a single count; and perhaps most
         significant of all, a capital offense or a non-capital offense – all on the basis of the same

16       facts.  Moreover, "[t]he grand jury is not bound to indict in every case where a conviction
         can be obtained."

17

18   474 U.S. at 263 (quoting United States v. Ciambrone, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly, J.,

19   dissenting)); accord Campbell v. Louisiana, 523 U.S. 392, 399 (1998) (The grand jury "controls not only

20   the initial decision to indict, but also significant decisions such as how many counts to charge and whether

21   to charge a greater or lesser offense, including the important decision whether to charge a capital crime.").

22   Nor would the January 2007 grand jury ever believe that it was empowered to assess the "the need to indict."

23   See id. at 264.  Judge Burns's grand jury is not Vasquez's grand jury.  The instructions therefore represent

24   structural constitutional error "that interferes with the grand jury's independence and the integrity of the

25   grand jury proceeding."  See United States v. Isgro, 974 F.2d 1091, 1094 (9th Cir. 1992).  The indictment

26   must therefore be dismissed.  Id.

27   The Navarro-Vargas II majority's faith in the structure of the grand jury *is not* a cure for the

28   instructions excesses.  The Navarro-Vargas II majority attributes "[t]he grand jury's discretion -- its

08CR00253-H

1   independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its

2   decisions." 408 F.3d at 1200.  As a result, the majority discounts the effect that a judge's instructions may

3   have on a grand jury because "it is the *structure* of the grand jury process and its *function* that make it

4   independent." Id. at 1202 (emphases in the original).

5       Judge Hawkins sharply criticized this approach.  The majority, he explains, "believes that the

6   'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability

7   of many of its decisions -- sufficiently protects that power." See id. at 1214 (Hawkins, J., dissenting).  The

8   flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond

9   making a probable cause determination ... unconstitutionally undermines the very structural protections that

10  the majority believes save[] the instruction." Id.  After all, it is an "'almost invariable assumption of the law

11  that jurors follow their instructions.'" Id. (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)).  If that

12  "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described

13  in Vasquez.  Indeed, "there is something supremely cynical about saying that it is fine to give jurors

14  erroneous instructions because nothing will happen if they disobey them." Id.

15      In setting forth Judge Hawkins' views, Mr. Karas understands that Judge Burns may not adopt them

16  solely because the reasoning that supports them is so much more persuasive than the majority's sophistry.

17  Rather, he sets them forth to urge the Court *not to extend* what is already untenable reasoning.

18      Here, again, the question is not an obscure interpretation of the word "should", especially in light

19  of the instructions and commentary by Judge Burns during voir dire discussed above - unaccounted for by

20  the Court in Navarro-Vargas II because they had not yet been disclosed to the defense, but an absolute ban

21  on the right to refuse to indict that directly conflicts with the recognition of that right in Vasquez, Campbell,

22  and both Navarro-Vargas II opinions.  Navarro-Vargas II is distinguishable on that basis, but not only that.

23      Judge Burns did not limit itself to denying the grand jurors the power that Vasquez plainly states they

24  enjoy.  He also excused prospective grand jurors who might have exercised that Fifth Amendment

25  prerogative, excusing "three [jurors] in this case, because they could not adhere to [that] principle...." See

26  Ex. A at 8; Ex. B at 17, 28.  The structure of the grand jury and the secrecy of its deliberations cannot

27  embolden grand jurors who are no longer there, likely because they expressed their willingness to act as the

28  conscience of the community.  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a

1   grand jury exercising its powers under <u>Vasquez</u> "serves ... to protect the accused from the other branches

2   of government by acting as the 'conscience of the community.'") (quoting <u>Gaither v. United States</u>, 413 F.2d

3   1061, 1066 & n.6 (D.C. Cir. 1969)).  The federal courts possess only "very limited" power "to fashion, on

4   their own initiative, rules of grand jury procedure," <u>United States v. Williams</u>, 504 U.S. 36, 50 (1992), and,

5   here, Judge Burns has both fashioned his own rules and enforced them.

6   **D.    The Instructions Conflict with <u>Williams</u>' Holding That There Is No Duty to Present
        Exculpatory Evidence to the Grand Jury.**

7

8          In <u>Williams</u>, the defendant, although conceding that it was not required by the Fifth Amendment,

9   argued that the federal courts should exercise their supervisory power to order prosecutors to disclose

10  exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment

11  common law.  <u>See</u> 504 U.S. at 45, 51.  <u>Williams</u> held that "as a general matter at least, no such 'supervisory'

12  judicial authority exists."  <u>See id.</u> at 47.  Indeed, although the supervisory power may provide the authority

13  "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct

14  amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by Judge

15  Burns and by Congress to ensure the integrity of the grand jury's functions,'" <u>id.</u> at 46 (citation omitted),

16  it does not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance."

17  <u>Id.</u> at 47 (emphasis added).  The federal courts possess only "very limited" power "to fashion, on their own

18  initiative, rules of grand jury procedure."  <u>Id.</u> at 50.  As a consequence, <u>Williams</u> rejected the defendant's

19  claim, both as an exercise of supervisory power and as Fifth Amendment common law.  <u>See id.</u> at 51-55.

20         Despite the holding in <u>Williams</u>, the instructions here assure the grand jurors that prosecutors would

21  present to them evidence that tended to undercut probable cause.  <u>See</u> Ex. A at 20.

22         Now, again, this emphasizes the difference between the function of the grand jury and the
           trial jury.  You're all about probable cause.  If you think that there's evidence out there that

23         might cause you say "well, I don't think probable cause exists," then it's incumbent upon you
           to hear that evidence as well.  As I told you, in most instances, *the U.S. Attorneys are duty-*

24         *bound to present evidence that cuts against what they may be asking you to do if they're*
           *aware of that evidence.*

25

26  <u>Id.</u> (emphasis added).  Moreover, the district court later returned to the notion of the prosecutors and their

27  duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of

28  [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you."  <u>See</u>

1   id. at 27.  The Ninth Circuit has already concluded it is likely this final comment is "unnecessary."  See

2   Navarro-Vargas, 408 F.3d at 1207.

3        This particular instruction has a devastating effect on the grand jury's protective powers, particularly

4   if it is not true.  It begins by emphasizing the message that Navarro-Vargas II somehow concluded was not

5   conveyed by the previous instruction: "You're all about probable cause."  See Ex. A at 20.  Thus, once again,

6   the grand jury is reminded that they are limited to probable cause determinations (a reminder that was

7   probably unnecessary in light of the fact that Judge Burns had already told the grand jurors that they likely

8   would be excused if they rejected this limitation).  The instruction goes on to tell the grand jurors that they

9   should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor

10  will present it.  The end result, then, is that grand jurors should consider evidence that goes against probable

11  cause, but, if none is presented by the government, they can presume that there is none.  After all, "in most

12  instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking

13  you to do if they're aware of that evidence."  See id.  Moreover, during voir dire, Judge Burns informed the

14  jurors that "my experience is that the prosecutors don't play hide-the-ball.  If there's something adverse or

15  that cuts against the charge, you'll be informed of that.  *They have a duty to do that*."  See Ex. B at 14-15

16  (emphasis added).  Thus, if the exculpatory evidence existed, it necessarily would have been presented by

17  the "duty-bound" prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear

18  in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented

19  to you."  See Ex. A at 27.

20       These instructions create a presumption that, in cases where the prosecutor does not present

21  exculpatory evidence, no exculpatory evidence exists.  A grand juror's reasoning, in a case in which no

22  exculpatory evidence was presented, would proceed along these lines:

> (1)  I have to consider evidence that undercuts probable cause.
> (2)  The candid, honest, duty-bound prosecutor would, in good faith, have presented
>       any such evidence to me, if it existed.
> (3)  Because no such evidence was presented to me, I may conclude that there is
>       none.

26       Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the

27  evidence presented represents the universe of all available exculpatory evidence; if there was more, the duty-

28  bound prosecutor would have presented it.

The instructions, therefore, discourage investigation -- if exculpatory evidence were out there, the prosecutor would present it, so investigation is a waste of time -- and provide additional support to every probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side of the equation because it was not presented. A grand jury so badly misguided is no grand jury at all under the Fifth Amendment.

## IV.

## MOTION FOR LEAVE TO FILE ADDITIONAL MOTIONS

***Defense counsel has received no discovery in this case.*** As more information comes to light, due to the Government providing additional discovery in response to these motions or an order of this Court, the defense may find it necessary to file further motions. It is, therefore, requested that defense counsel be allowed the opportunity to file further motions based upon information gained through the discovery process.

## V.

## CONCLUSION

For the foregoing reasons, Mr. Karas respectfully requests that the Court grant his motion to compel discovery and preserve evidence.

Respectfully submitted,

Dated: February 14, 2008

*s/ Hanni M. Fakhoury*
**HANNI M. FAKHOURY**
Federal Defenders of San Diego, Inc.
Attorneys for Mr. Karas